**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| IMBERATEK LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>SONY GROUP CORPORATION and SONY CORPORATION,<br><br>    Defendants. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff ImberaTek LLC ("ImberaTek") brings this action against Defendants Sony Group Corporation and Sony Corporation (collectively, "Sony" or "Defendants") and alleges as follows:

**NATURE OF THE ACTION**

1.    This is a civil action for patent infringement (hereinafter the "Action"), brought under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, seeking damages and other relief arising out of Defendants' infringement of United States Patent Nos. 7,609,527 (the "527 Patent"), 8,222,723 (the "723 Patent"), 8,487,194 (the "194 Patent"), and 9,107,324 (the "324 Patent") (collectively, the "Asserted Patents").

2.    ImberaTek owns the entire right, title, and interest in and to each of the Asserted Patents.

3.    Defendants have infringed each Asserted Patent by, without ImberaTek's authorization, making, using, offering to sell, and selling in, and/or importing into the United States products including certain semiconductor technology. Further, Defendants have indirectly infringed each Asserted Patent by, without ImberaTek's authorization, making, selling, and

supporting products including certain semiconductor technology knowing that the same will be imported into, sold, and used in the United States and cause direct infringement.

## THE PARTIES

4. Plaintiff ImberaTek is a Texas corporation with an address at 14205 North Mopac Expressway, 5th Floor, Austin, TX, 78728.

5. On information and belief, Defendant Sony Group Corporation is a Japanese corporation with its principal place of business at 1-7-1 Konan Minato-ku, Tokyo, 108-0075 Japan.

6. On information and belief, Defendant Sony Corporation is a Japanese corporation and a wholly owned subsidiary of Defendant Sony Group Corporation with its principal place of business at 1-7-1 Konan Minato-ku, Tokyo, 108-0075 Japan. (*See* https://www.sony.co.jp/en/corporate/.)

7. On information and belief, Sony Corporation of America ("SCA") is characterized by Sony as "the U.S. headquarters of Defendant Sony Group Corporation," is directly or indirectly wholly owned by Defendant Sony Group Corporation, and is located in New York, NY. (*See*, *e.g.*, https://www.sony.com/content/sony/en/en_us/SCA/who-we-are/overview.html.)

8. On information and belief, Sony Electronics Inc. ("SEI") is a subsidiary of SCA, is directly or indirectly wholly owned by Defendant Sony Group Corporation, and is headquartered in San Diego, California. (*See*, *e.g.*, https://www.sony.com/content/sony/en/en_us/SCA/who-we-are/overview.html#electronics.)

9. On information and belief, Defendants, in concert with and through control of, SCA and SEI, have engaged, and continue to engage, in making, using, selling, offering for sale, and/or importing, and/or inducing their subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including

within this District, products, such as mobile phones and smart phones, accused of infringement herein.  (*See*,  *e.g.*,  https://sony.mediaroom.com/2022-09-01-Sony-Electronics-Introduces-the-Xperia-R-5-IV-Premium-Smartphone-Designed-for-Experiencing-and-Creating-Content.)

10.    On information and belief, Sony operates, together with SCA, and SEI, and other subsidiaries, and affiliates, as part of a group of companies referred to herein as the "Sony Group." (*See*,    *e.g.*,    https://www.sony.com/en/SonyInfo/CorporateInfo/Data/organization.html; https://www.sony.com/en/SonyInfo/News/Press/202005/20-039E/.)

11.    On information and belief, Sony operates in agency as part of the Sony Group. Sony in agency with the Sony Group provides a distribution channel of infringing products within this District and the U.S. nationally, where Sony regularly imports and inserts into the stream of commerce smartphones such that infringing products will be offered for sale and sold in this District and throughout the United States.

12.    On information and belief, Sony, individually and in concert with others in the Sony Group, participates in the design, development, manufacture, use, offer for sale, sale, and/or importation into the United States of mobile phone products that infringe one or more of the Asserted Patents.

13.    On information and belief, Sony has induced, and continues to induce, its subsidiaries, affiliates, retail partners, and customers in the past, present, and future to make, use, sell, offer for sale, and/or import throughout the United States, including within this District, mobile phone products accused of infringement. On information and belief, Sony has provided a distribution channel of infringing products within this District and the U.S. nationally. On information and belief, Sony, individually and in concert with others in the Sony Group,

purposefully has directed infringing mobile phone products into established distribution channels within this District and the U.S. nationally.

14.     On information and belief, Sony maintains a corporate presence in the United States via at least its U.S.-based subsidiaries, including at least SCA and SEI.

15.     On information and belief, Sony and its U.S.-based subsidiaries (which act as part of a global network of overseas sales and manufacturing subsidiaries on behalf of Sony) have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than arm's length. For example, Sony, alone and via at least the activities of its U.S.-based subsidiaries (*e.g.*, SCA and SEI), has conducted business in the United States, including importing, distributing, and selling mobile phones that infringe the Asserted Patents in Texas and this judicial district. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state…."); *see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

16.     Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Sony's electronic devices, such as its mobile phones, with distributors and customers operating in and maintaining a significant business presence in the U.S. and/or its U.S. subsidiaries (including SCA and SEI), Defendants do business in the U.S., the state of Texas, and in the Eastern District of Texas.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over ImberaTek's claims of infringement of the Asserted Patents pursuant to 28 U.S.C. §§ 1331 (federal question), 1338 (action arising under an Act of Congress relating to patents), 2201 (creation of remedy), and 2202 (further relief). Certain claims in this Action arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c). As detailed above, Defendants are foreign entities that may be sued in any judicial district under 28 U.S.C. § 1391(c)(3).

19.    This Court has general and specific personal jurisdiction over Defendants pursuant to due process and/or the Texas Long Arm Statute because, *inter alia*, (i) Defendants have done and continue to do business in Texas, and (ii) Defendants have, directly and through intermediaries, committed acts of patent infringement in the State of Texas, including making, using, offering to sell, and/or selling accused products in Texas, and/or importing accused products into Texas, either directly or vicariously, including by Internet sales and sales via retail and wholesale stores, inducing others to commit acts of patent infringement in Texas, and/or committing a least a portion of any other infringements alleged herein. Defendants have placed infringing products into the stream of commerce, via an established distribution channel, with the knowledge and/or understanding that such products would be sold in Texas, including in this District. Defendants have derived substantial revenues from their infringing acts occurring within Texas and within this District. Defendants have substantial business in this State and District, including: (a) at least part of their infringing activities alleged herein; and (b) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported, and services provided to Texas residents

vicariously through and/or in concert with their alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers.

20. This Court has personal jurisdiction over Defendants, directly or through intermediaries, distributors, importers, customers, subsidiaries, and/or consumers including their U.S.-based subsidiaries, *e.g.*, SCA and SEI. Through direction and control of such subsidiaries, Defendants have committed acts of direct and/or indirect patent infringement within Texas, and elsewhere within the United States, giving rise to this action and/or have established minimum contacts with Texas such that personal jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.

21. On information and belief, SCA and SEI are wholly-owned subsidiaries of Defendant Sony Group Corporation. The primary business of SCA and SEI is the marketing and sale of electronic products in the United States. Defendant Sony Group Corporation has a 100% controlling ownership interest, directly or indirectly, in SCA and SEI and maintains more than half of the voting rights for such subsidiaries as its basis for control. Upon information and belief, Defendant Sony Group Corporation compensates SCA and SEI for its sales support services in the United States. As such, Defendant Sony Group Corporation has a direct financial interest in its U.S.-based subsidiaries, and *vice versa*.

22. Personal jurisdiction is proper because Defendants have committed acts of infringement in this District. This Court has personal jurisdiction over Defendants because, *inter alia*, this action arises from activities Defendants purposefully directed towards the State of Texas and this District.

23. Exercising personal jurisdiction over Defendants in this District would not be unreasonable given Defendants' contacts in this District, the interest in this District of resolving

disputes related to products sold herein, and the harm that has occurred and would occur to ImberaTek.

24.    In addition, Defendants, either alone or in concert with their subsidiaries, have knowingly induced and continue to knowingly induce infringement within this District by advertising, marketing, offering for sale, selling, importing, and distributing infringing mobile phones within this District to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, support, and software updates (*see, e.g.,* https://www.sony.com/electronics/support/mobile-phones-tablets-mobile-phones; https://www.sony.com/electronics/support/mobile-phones-tablets-mobile-phones/xperia-1-v-256gb/downloads), which facilitate, direct, or encourage the use of infringing mobile phones with knowledge thereof.

25.    Personal jurisdiction also exists specifically over Defendants because they, directly or through affiliates, subsidiaries, agents, or intermediaries, transact business in this State or purposefully directed at this State (including, without limitation, retail stores) by making, importing, offering to sell, selling, and/or having sold infringing mobile phone products within this State and District or purposefully directed at this State or District.

26.    To the extent Defendants are not subject to jurisdiction in any state's court of general jurisdiction, exercising jurisdiction over Defendants in this State and this District would be consistent with due process and this State's long-arm statute and under national contacts in light of facts alleged in this Complaint.

27.    In addition, Defendants, directly or through affiliates, subsidiaries, agents, or intermediaries, have placed infringing products into the stream of commerce knowing they will be imported into the United States and sold and used in Texas, and economically benefit from the

retail sale of infringing products in this State. For example, on information and belief, Defendants' products have been sold and made available for sale in this District at Best Buy retail stores and also have been available for sale and offered for sale in this District through online retailers such as Best Buy, Walmart, and Amazon. Defendants also have advertised their infringing products and provided customer support of their infringing products to consumers in Texas and this District through their agent's websites. (*See*, *e.g.*, https://www.sony.com/electronics/support/mobile-phones-tablets.)

28.     As discussed in detail herein, Defendants have infringed (literally and/or under the doctrine of equivalents), directly, indirectly, and/or through subsidiaries, agents, representatives, or intermediaries, one or more claims of each of the Asserted Patents by making, using, importing, testing, supplying, causing to be supplied, selling, and/or offering for sale in the United States mobile phone products that infringe at least one claim of each of the Asserted Patents, including but not limited to, on information and belief, the following Sony Xperia series mobile phones: Xperia 5 II, Xperia 5 III, Xperia 5 IV, Xperia PRO, Xperia PRO-I, Xperia 1 II, Xperia 1 III, Xperia 1 IV, and Xperia 1 V (the "Accused Products").

29.     On information and belief, Sony controls or otherwise directs and authorizes all activities of its U.S.-based subsidiaries, including SCA and SEI. Such directed and authorized activities include, the U.S. subsidiaries' using, offering for sale, selling, and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the Asserted Patents. On information and belief, the Defendants' U.S.-based subsidiaries (*e.g.*, SCA and SEI) are authorized to import, distribute, sell, or offer for sale the Accused Products on behalf of Defendants. For example, on information and belief, Defendants research, design, develop, and manufacture the Accused Products and then in

concert with, and upon direction to, their U.S.-based subsidiaries import, distribute, offer for sale, and sell the Accused Products in the United States. *See*, *e.g.*, *United States v. Hui Hsiung*, 778 F.3d 738, 743 (9th Cir. 2015) (finding that the sale of infringing products to third parties rather than for direct import into the U.S. did not "place [defendants'] conduct beyond the reach of United States law [or] escape culpability under the rubric of extraterritoriality"). Furthermore, on information and belief, Defendants' U.S.-based subsidiaries also administer, on behalf of Defendants, requests for service under and any disputes arising from Defendants' limited warranty of the Accused Products sold in the U.S., including in Texas and this judicial district. Thus, Defendants' U.S.-based sales subsidiaries conduct infringing activities on behalf of Defendants.

30.     On information and belief, Defendants' U.S.-based sales subsidiaries' corporate presence in the United States gives Defendants the business advantages that they would have enjoyed if they conducted their business through their own offices or paid agents in the United States, including in the State of Texas. On information and belief, Defendants' U.S.-based sales subsidiaries are authorized to import, distribute, sell, and offer for sale the Accused Products on behalf of Defendants. For example, Defendants' U.S.-based sales subsidiaries operate within Defendants' global network of sales subsidiaries in North and South America, Europe, Asia, Australia, and the Middle East. In the U.S., including within the Eastern District of Texas, Defendants' Accused Products have been imported, distributed, offered for sale, and sold by Defendants at least via Defendants' U.S. based sales subsidiaries.

31.     On information and belief, via Defendants' alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers maintaining a business presence, operating in, and/or residing in the U.S., Defendants' products, including products accused of infringing the Asserted Patents, are or have been widely distributed and sold in retail

stores, both brick and mortar and online, in Texas including within this judicial district. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-cv-00197-JRG, 2019 WL 1979930, at *3 (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently plead that purchases of infringing products outside of the United States for importation into and sales to end users in the U.S. may constitute an offer to sell under § 271(a)). For example, on information and belief, Defendants' Accused Products have been sold to end users by Defendants and their U.S.-based subsidiaries, distributors, and customers, including, but not limited to, SCA and SEI, online and at retail stores located throughout the Eastern District of Texas.

32. On information and belief, Defendants have placed infringing products into the stream of commerce via established distribution channels comprising at least subsidiaries and distributors, such as SCA and SEI, and customers such as Walmart, Best Buy, and Amazon, with the knowledge and/or intent that those products are and/or will be imported, used, offered for sale, sold, and continue to be sold in the United States and Texas, including in this judicial district. As a result, Defendants have, vicariously through and/or in concert with their alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers, placed the Accused Products into the stream of commerce via established distribution channels with the knowledge and/or intent that those products were sold and continue to be sold in the United States and Texas, including in this judicial district.

33. In the alternative, the Court has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise

under federal law, Defendants are not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over Defendants is consistent with the U.S. Constitution.

34.     Defendants are subject to service of process upon the Texas Secretary of State under Texas Civil Practice and Remedy Code § 17.044(b). The Texas Secretary of State is an agent for service of process on Defendants because Defendants are nonresidents who engage in business in this State, but do not maintain a regular place of business in this State or a designated agent for service of process, and because this action arises out of the business Defendants do and have done in this State and to which Defendants are a party. This action arises out of business Defendants ds and have done in this State because Defendants have infringed and continue to infringe the Asserted Patents in this State, which constitutes "commit[ing] a tort a whole or in part in this state." Tex. Civ. Prac. & Rem. Code § 17.042(2).

35.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, among other things, Defendants are not residents in the United States, and thus may be sued in any judicial district, including this one, pursuant to 28 U.S.C. § 1391(c)(3). *See In re HTC Corp.*, 889 F.3d 1349, 1357 (Fed. Cir. 2018) ("The Court's recent decision in TC Heartland does not alter" the alien-venue rule.).

**FACTUAL ALLEGATIONS**

**A.      Background**

36.     This lawsuit involves significant, groundbreaking advancements in the manufacturing of semiconductor devices. These innovations were developed by Imbera Electronics Oy, a pioneering Finnish company which started to develop embedded electronics packaging technology and manufacturing solutions decades ago. Over the years, these innovations have enabled significant advancements in the field.

Page 11 of 44

37.    The Asserted Patents are generally directed to novel and non-obvious techniques to leverage semiconductors in electronic modules such as printed circuit boards and package substrates. The inventions of the Asserted Patents provide technical, manufacturing, and economical advantages by, for example, designing an electronic module with solid bump contact zones to improve a conductive-pattern layer (527 Patent at 3:8-5:53), manufacturing an electric module with conductive pattern layers (723 Patent at 2:56-5:10), and manufacturing components with specific contact surfaces (324 Patent at 3:10-4:41, 194 Patent at 1:48-2:56).

**B.    The Asserted Patents**

38.    The 527 Patent is titled "Electronic Module" and issued on October 27, 2009. The named inventors on the 527 Patent are Risto Tuominen and Petteri Palm. A true and correct copy of the 527 Patent is attached hereto as Exhibit 1.

39.    The 723 Patent is titled "Electronic Module Having A Conductive Pattern Layer" and issued on July 17, 2012. The named inventors on the 723 Patent are Risto Tuominen and Petteri Palm. A true and correct copy of the 723 Patent is attached hereto as Exhibit 2.

40.    The 194 Patent is titled "Circuit Board Including An Embedded Component" and issued on July 16, 2013. The named inventors on the 194 Patent are Risto Tuominen and Petteri Palm. A true and correct copy of the 194 Patent is attached hereto as Exhibit 3.

41.    The 324 Patent is titled "Circuit Module and Method of Manufacturing the Same" and issued on August 11, 2015. The named inventors on the 324 Patent are Petteri Palm, Risto Tuominen, and Antti Iihola. A true and correct copy of the 324 Patent is attached hereto as Exhibit 4.

42. ImberaTek is the owner of all rights, title, and interest in and to the Asserted Patents. ImberaTek possesses all rights to sue and recover past and future damages for any infringement of the Asserted Patents.

### C. The Accused Products and Infringing Activities

43. Defendants have offered numerous products, including but not limited to the Accused Products, which include, without limitation, one or more infringing Power Management Integrated Circuits ("PMICs") such as PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMIC components, and an infringing Application Processor ("AP") such as the SM8450. (*See* Exhibits 14-52.) On information and belief, each of those PMICs and APs, as used in an Accused Product, infringes each of the Asserted Patents. On information and belief, the Xperia PRO, Xperia 1 II, and Xperia 5 II include at least the PM8150A, PM8150B, and PM8250 PMICs, the Xperia PRO-I, Xperia 1 III, and Xperia 5 III include at least the PM8350, PM8350B, and PM8350C PMICs, the Xperia 1 IV and Xperia 5 IV include at least the PM8350, PM8350C, PM8350BH, and PM8450 PMICs and the SM8450 AP, and the Xperia 1 V includes at least the PM8550BH PMIC.

44. Defendants have infringed the Asserted Patents by making, using, offering to sell, importing, and selling (directly or through and in concert with intermediaries) at least the Accused Products in this Judicial District and elsewhere in the United States. Further, Defendants have indirectly infringed the Asserted Patents by, without ImberaTek's authorization, making, selling, and/or supporting the Accused Products knowing that the same will be imported into, sold, and/or used in the United States and cause direct infringement.

45. As detailed below, each element of at least one claim of the Asserted Patents is literally present in each Accused Product. To the extent that any element is not literally present,

each such element is present under the doctrine of equivalents because it performs substantially the same function in substantially the same way to achieve substantially the same result, and any differences between the accused product and claim element are insubstantial.

### D. The Negotiations Between the Parties and Defendants' Knowledge of the Asserted Patents

46.    On information and belief, Defendants have been aware of the Asserted Patents since at least January 27, 2021 when ImberaTek sent a letter to Kenichiro Yoshida, the Chairman, President, and CEO of Sony Corporation,[1] and to Sony Corporation of America (i) asserting that Defendants were "likely utilizing and causing [their] customers and users to utilize," *inter alia*, the 527, 723, and 324 Patents and "should explore taking a license from ImberaTek to cover both [their] past and future utilization of" those patents, (ii) including an "exemplary listing of our patents" on an Exhibit A that also included the 194 Patent, and (iii) stating that "ImberaTek expects that you may currently be using, or will in the future be using, additional patented inventions from this portfolio." (*See* Ex. 5.) ImberaTek further informed Defendants that it "is willing to immediately negotiate a license under its patent portfolio" and "would like to explore an amicable business resolution . . . ." (*See id.*) On March 4, 2021, Peter Toto, a Senior Vice President of the Intellectual Property Department of Sony Corporation of America, responded, requesting claim charts comparing claims to products. (*See* Ex. 6.)

47.    On August 13, 2023, ImberaTek followed up with Mr. Toto and Lee Hill, on information and belief, Senior Intellectual Property Counsel for Sony, on ImberaTek's January 27, 2021 letter, and, on August 18, 2023, Mr. Toto responded by requesting claim charts. (*See* Exhibit 7.) On August 24, 2023, ImebraTek responded by sending Mr. Toto a draft non-disclosure

---

[1] (*See* https://www.sony.com/en/pressroom/executives/Kenichiro_Yoshida_202504E.pdf.)

agreement ("NDA") and stating that once an NDA is in place, ImberaTek would provide claim charts showing that Defendants' Xperia 5 III and 5 IV phones infringe, *inter alia*, the 527 Patent, 723 Patent and 324 Patent. (*See id.*) Over the course of the next several weeks, ImberaTek and Mr. Hill exchanged drafts of the NDA and had calls to discuss the NDA and ImberaTek's licensing proposal. (*See id.*)

48.    The NDA was executed on September 28, 2023 between ImberaTek and Defendant Sony Group Corporation, and Shizuka Sayama, General Manager of IP Alliance and Licensing Department signed the NDA on behalf of Sony Group Corporation. (*See id.*; Exhibit 8.) On information and belief, on or about November 6, 2023, ImberaTek sent Mr. Hill detailed claim charts showing how the Xperia 5 III and Xperia 5 IV phones infringe, *inter alia*, the 527 Patent, 723 Patent and 324 Patent. (*See* Exhibit 7 (including copies of the claim charts for the 527, 723, and 324 Patents).) On information and belief, ImberaTek had a call with Mr. Hill on December 12, 2023 to discuss the claims charts, and on December 18, 2023, ImberaTek sent Mr. Hill an updated version of its patent portfolio, which included the Asserted Patents. (*See id.*) On January 16, 2024, ImberaTek followed up with Mr. Hill about having a technical discussion of the claim charts, and on January 19, 2024 Mr. Hill responded saying Sony was still in the process of obtaining technical input from its suppliers. (*See id.*) On January 22, 2024, ImberaTek responded that it was disappointing that Sony had had the claim charts for two months but still was not ready for a technical discussion on them. (*See id.*) Mr. Hill responded on January 29, 2024 saying that Sony still needed technical input from its suppliers. (*See id.*) On February 11, 2024, ImberaTek followed up again, pointed out it had been over two weeks since Mr. Hill's last communication, and asked to schedule a meeting in the next week or two. (*See id.*) On information and belief, ImberaTek and Mr. Hill had a call on March 5, 2024 to discuss the claim charts. (*See* Exhibit 9.)

49.     On March 19, 2024, Mr. Hill sent ImberaTek Sony's written questions on the claim charts, which included several questions about claim interpretation and statements that claims of ImberaTek's patents are invalid in light of certain references. (*See* Exhibit 10.) On May 23, 2024, ImberaTek provided its responses to Sony's questions, stating that it was not providing a claim interpretation and that Sony had not provided any evidence that any claims are invalid. ImberaTek then followed up with Mr. Hill on June 13 and July 2, 2024. (*See id*.; Exhibit 11.) On July 3, 2024, Mr. Hill responded by asking if ImberaTek would respond to questions relating to invalidity and asking for a call. (*See* Exhibit 12.) On July 5, 2024, ImberaTek responded that (i) Sony's identification of prior art references with no technical explanation or claim charts was not a reasonable way for ImberaTek to understand Defendants' invalidity positions, (ii) the negotiations had been going on for approximately 10 months and that it did not see further technical discussions as being productive, and (iii) discussion of a business solution would be best. (*See id*.) ImberaTek further asked for another call. (*See id*.) Having not received a response, on July 31, 2024, ImberaTek followed up with Mr. Hill asking for an update. (*See id*.) On October 22, 2024, having still not received a response, ImberaTek advised Mr. Hill that "Sony utilizes and causes its customers and users to utilize [the 194 Patent]. By way of non-limiting example, the processors used in your cell phones since at least the Xperia 10 use this patent.  This is a further example of why Sony requires a license to ImberaTek's patent portfolio." (*See* Exhibit 13.) On November 11, 2024, Mr. Hill responded, stating, "[W]e do appreciate your offer for possible resolution[,] [but] we are not in a position solely to pursue a resolution at this time with many open technical issues outstanding." (*See* Exhibit 53.) In the same communication, Mr. Hill categorically invoked without any analysis or specificity patent invalidity assertions of a third party to a prior litigation. (*See id.*) Mr. Hill made this further unsupported argument despite ImberaTek's statements four months

earlier that (i) Sony's identification of prior art references with no technical explanation or claim charts was not a reasonable way for ImberaTek to understand Defendants' invalidity positions, (ii) the negotiations had been going on for approximately 10 months and that it did not see further technical discussions as being productive, and (iii) discussion of a business solution would be best. (*See* Exhibit 12.)

50. Thus, over the course of five years, ImberaTek was met with ignored communications, delay, and prolonged periods for responses. In this regard, in the more than two and one-half years since ImberaTek provided detailed claim charts to Sony, Defendants have never identified any reason why Sony's products do not infringe. Nor did Defendants substantively respond to ImberaTek's licensing offers or provide a good faith counteroffer. Instead, Defendants engaged in holdout behavior, refusing to engage in good faith negotiations, all while knowingly and willfully continuing to infringe.

51. In light of the foregoing, Defendants, on information and belief, by no later than January 27, 2021, were provided actual notice of infringement of each Asserted Patent, knew of each of the Asserted Patents, and knew or should have known since that date that the manufacture, use, importation, offer for sale, and/or sale of the Accused Products infringed the Asserted Patents. Additionally, for the 527, 723, and 324 Patents, Defendants, by no later than August 24, 2023, were provided actual notice of infringement of the 527, 723, and 324 Patents, knew of the 527, 723, and 324 Patents, and knew or should have known since that date that the manufacture, use, importation, offer for sale, and/or sale of the Accused Products infringed the 527, 723, and 324 Patents. Additionally, for the 194 Patent, Defendants, by no later than October 22, 2024, were provided actual notice of infringement of the 194 Patent, knew of the 194 Patent, and knew or should have known since that date that the manufacture, use, importation, offer for sale, and/or

sale of the Accused Products infringed the 194 Patent. Additionally, Defendants have knowledge of the 324 and 194 Patents and their infringement thereof by the date on which this Complaint was filed.

### E.     Claims for Patent Infringement

52.     The allegations provided below are exemplary and without prejudice to ImberaTek's infringement contentions provided pursuant to the Court's scheduling order and local rules. In providing these allegations, ImberaTek does not provide or imply any particular claim construction or the precise scope of the claims. ImberaTek's claim construction contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and local rules.

53.     The below infringement allegations are based on publicly available information and a reasonable investigation of the structure and operation of the Accused Products. ImberaTek reserves the right to modify this description, including, for example, on the basis of information that it obtains during discovery about the Accused Products and the Asserted Patents.

54.     To the extent any patentee's or licensee's product was sold in the United States that embodied any one of the Asserted Patents and was not marked with that Patent, ImberaTek is, nevertheless, entitled to past damages for the entire period after actual notice occurred as described *supra*.

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 7,609,527

55.     ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

56.     During the term of the 527 Patent, the 527 Patent was valid and enforceable, and Defendant, without ImberaTek's authority, made, used, offered to sell, sold, and imported into the

United States at least the Accused Products, certain of which directly infringe one or more claims of the 527 Patent, literally or under the doctrine of equivalents.

57.    At least the Xperia 5 II, Xperia 5 III, Xperia 5 IV, Xperia PRO, Xperia PRO-I, Xperia 1 II, Xperia 1 III, Xperia 1 IV, and Xperia 1 V, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 527 Patent having the same or similar PMIC components (the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs) as the forgoing specifically identified product models (the "527 Accused Products"), include electronic components that infringe at least one claim of the 527 Patent. For example, claim 1 recites:

An electronic module, comprising:

a first conductive-pattern layer having a first surface,

first solid contact bumps solderlessly made on the first surface of the first conductive-pattern layer and metallurgically and electrically connected thereto,

a component having flat contact zones,

second solid contact bumps solderlessly made on the flat contact zones and metallurgically and electrically connected thereto, and

an insulating-material layer on the first surface of the first conductive pattern layer,

wherein the component is embedded in the insulating-material layer and wherein the second solid contact bumps made on the flat contact zones of the component are metallurgically, electrically and solderlessly connected to the first solid contact bumps made on the first surface of the first conductive-pattern layer.

58.    The 527 Accused Products and Defendants' infringing activities violate one or more subsections of 35 U.S.C. § 271.

59.    On information and belief, Defendants infringed, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims of the 527 Patent, including at least claim 1, by making, using, offering to sell, selling, and importing the 527 Accused Products

without authority or license. The 527 Accused Products, and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims of the 527 Patent. In that regard, the exemplary claim charts attached as Exhibits 14-22 show how the 527 Accused Products include each element of claim 1 of the 527 Patent. Defendants have thereby directly infringed one or more claims of the 527 Patent.

60.    As shown in the charts, the 527 Accused Products include "[a]n electronic module, comprising: a first conductive-pattern layer having a first surface." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 527 Accused Products show a first conductive-pattern layer having a first surface, where a copper Energy Dispersive X-Ray ("EDX")[2] map shows the specified layer is conductive. (*See* Exhibits 14-22.)

61.    As also shown in the charts, the 527 Accused Products include "first solid contact bumps solderlessly made on the first surface of the first conductive-pattern layer and metallurgically and electrically connected thereto." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs  used in the 527 Accused Products show the first solid contact bump is solderlessly made on, and metallurgically and electrically connected to, the first surface of the first conductive-pattern layer, as shown by the absence of tin in a tin EDX map and presence of copper in a copper EDX map. (*See* Exhibits 14-22.)

62.    As further shown in the charts, the 527 Accused Products include "a component having flat contact zones." For example, cross sections of the PM8150A, PM8150B, PM8250,

---

[2] "EDX" and "EDS" are both abbreviations of the same term, "Energy Dispersive X-Ray Spectroscopy." These abbreviations may be used interchangeably.

PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 527 Accused Products show a component having flat contact zones. (*See* Exhibits 14-22.)

63.    As further shown in the charts, the 527 Accused Products include "second solid contact bumps solderlessly made on the flat contact zones and metallurgically and electrically connected thereto." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 527 Accused Products show the second solid contact bump is solderlessly made on, and metallurgically and electrically connected to, the flat contact zone. Further, the absence of tin in a tin EDX shows that the second solid contact bumps are solderlessly made on the flat contact zones. (*See* Exhibits 14-22.)

64.    As further shown in the charts, the 527 Accused Products include "an insulating-material layer on the first surface of the first conductive-pattern layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 527 Accused Products show an insulating material layer on the first surface of the first conductive-pattern layer, where the insulating material layer contains insulating, *i.e.*, non-conductive, materials (O, Si), as shown in the EDX maps. (*See* Exhibits 14-22.)

65.    As further shown in the charts, the 527 Accused Products include "wherein the component is embedded in the insulating-material layer and wherein the second solid contact bumps made on the flat contact zones of the component are metallurgically, electrically and solderlessly connected to the first solid contact bumps made on the first surface of the first conductive-pattern layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 527

Accused Products show the component is embedded in the insulating-material layer and the second solid contact bumps and first solid contact bumps are metallurgically, electrically and solderlessly connected. Further, the absence of tin in a tin EDX shows that the second solid contact bumps and first solid contact bumps are solderlessly connected. (*See* Exhibits 14-22.)

66.     By at least January 27, 2021, ImberaTek disclosed the existence of the 527 Patent to Defendants and informed Defendants that they were "likely utilizing and causing [their] customers and users to utilize" the 527 Patent and "should explore taking a license from ImberaTek to cover both [their] past and future utilization of" that patent. On August 24, 2023, ImebraTek informed Defendants it would provide them with claim charts showing that Defendants' Xperia 5 III and 5 IV phones infringe the 527 Patent, and, on or about November 6, 2023, ImberaTek sent Defendants claim charts reading the 527 Patent on Defendants' products. Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, on information and belief, Defendants have had knowledge of the 527 Patent and that their activities infringe the 527 Patent since at least January 27, 2021 and no later than August 24, 2023. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021 and no later than August 24, 2023 that their customers, distributors, and other purchasers of the 527 Accused Products infringed the 527 Patent at least because Defendants had knowledge of their infringement of the 527 Patent.

67.     Defendants' acts of infringement of the 527 Patent have been committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 527 Patent, nor could it reasonably or subjectively have believed that the patent is invalid. Despite that

knowledge and subjective belief, Defendants continued their infringing activities. Defendants' directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

68.    On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 527 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the 527 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of the 527 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website, press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 527 Accused Products or products containing infringing chips in the 527 Accused Products. Defendants also manufactured the 527 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge of the 527 Patent and their infringement since at least at least January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

69.    On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed one or more claims of the 527 Patent by offering to sell, selling, and/or importing into the United States material components of the 527 Accused Products that constitute a material part of the inventions, knowing the same to be

especially made or especially adapted for use in an infringement of the 527 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the 527 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 1 of the 527 Patent for the reasons set forth above.

70.    The infringing semiconductor chips of the 527 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

71.    ImberaTek has suffered damages as a result of Defendants' infringement of the 527 Patent.

**COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,222,723**

72.    ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

73.    During the term of the 723 Patent, the 723 Patent was valid and enforceable, and Defendant, without ImberaTek's authority, made, used, offered to sell, sold, and imported into the United States at least the Accused Products, certain of which directly infringe one or more claims of the 723 Patent, literally or under the doctrine of equivalents.

74.    At least the Xperia 5 II, Xperia 5 III, Xperia 5 IV, Xperia PRO, Xperia PRO-I, Xperia 1 II, Xperia 1 III, Xperia 1 IV, and Xperia 1 V, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 723 Patent having the same or similar PMIC components (the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs) as the forgoing

specifically identified product models (the "723 Accused Products"), infringe at least one claim of the 723 Patent. For example, claim 1 recites:

An electronic module, comprising:

a conductive-pattern layer;

an insulating-material layer supporting the conductive-pattern layer;

at least one component inside the insulating-material layer, the at least one component comprising a first surface and contact zones on the first surface;

a first hardened adhesive layer on the first surface of the at least one component;

a second hardened adhesive layer in contact with the conductive-pattern layer and the first hardened adhesive layer;

holes in the first and second hardened adhesive layer at the locations of the contact zones; and

conductive material in the holes and in electrical connection with the contact zones of the component and the conductive-pattern layer, wherein the first hardened adhesive layer has a first composition and the second hardened adhesive layer has a second composition different from the first composition.

75.    The 723 Accused Products and Defendants' infringing activities violate one or more subsections of 35 U.S.C. § 271.

76.    On information and belief, Defendants infringed, in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims of the 723 Patent, including at least claim 1, by making, using, offering to sell, selling, and importing the 723 Accused Products without authority or license. The 723 Accused Products, and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims of the 723 Patent. In that regard, the exemplary claim charts attached as Exhibits 23-31 show how the 723 Accused Products include each element of claim 1 of the 723 Patent. Defendants thereby have directly infringed one or more claims of the 723 Patent.

77. As shown in the charts, the 723 Accused Products include "[a]n electronic module, comprising: a conductive-pattern layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 723 Accused Products show a conductive-pattern layer, where a copper EDX map shows the specified layer is conductive. (*See* Exhibits 23-31.)

78. As also shown in the charts, the 723 Accused Products include "an insulating-material layer supporting the conductive-pattern layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 723 Accused Products show an insulating-material layer supports the conductive-pattern layer and consists of insulating (*i.e.*, non-conductive) polymer dielectrics containing atoms of oxygen and silicon, as detected in EDX scans. (*See* Exhibits 23-31.)

79. As further shown in the charts, the 723 Accused Products include "at least one component inside the insulating-material layer, the at least one component comprising a first surface and contact zones on the first surface." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 723 Accused Products show at least one component inside the insulating material layer, the at least one component comprising a first surface and contact zones on the first surface. (*See* Exhibits 23-31.)

80. As further shown in the charts, the 723 Accused Products include "a first hardened adhesive layer on the first surface of the at least one component." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 723 Accused Products show a first hardened adhesive layer on the first surface of the at least one component. (*See* Exhibits 23-31.)

81.     As further shown in the charts, the 723 Accused Products includes "a second hardened adhesive layer in contact with the conductive-pattern layer and the first hardened adhesive layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 723 Accused Products show a second hardened adhesive layer in contact with the conductive-pattern layer and the first hardened adhesive layer. (*See* Exhibits 23-31.)

82.     As further shown in the charts, the 723 Accused Products include "holes in the first and second hardened adhesive layer at the locations of the contact zones." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 723 Accused Products show holes in the first and second hardened adhesive layer at the locations of the contact zones. (*See* Exhibits 23-31.)

83.     As further shown in the charts, the 723 Accused Products include "conductive material in the holes and in electrical connection with the contact zones of the component and the conductive-pattern layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 723 Accused Products show conductive material in the holes and in electrical connection with the contact zones of the component and the conductive-pattern layer, where the electrical connection formed between the contact zone and the conductive-pattern layer is shown in a copper EDX map. (*See* Exhibits 23-31.)

84.     As further shown in the charts, the 723 Accused Products include "wherein the first hardened adhesive layer has a first composition and the second hardened adhesive layer has a second composition different from the first composition." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and

PM8550BH PMICs used in the 723 Accused Products show the first hardened adhesive layer has a first composition and the second hardened adhesive layer has a second composition different from the first composition, where compositions of the first hardened adhesive layer and the second hardened adhesive layer are different as can be seen by different textures in a Scanning Electron Microscope ("SEM") image and different colors in an EDX layered map. (*See* Exhibits 23-31.)

85.    By at least January 27, 2021, ImberaTek disclosed the existence of the 723 Patent to Defendants and informed Defendants that they were "likely utilizing and causing [their] customers and users to utilize" the 723 Patent and "should explore taking a license from ImberaTek to cover both [their] past and future utilization of" that patent. On August 24, 2023, ImebraTek informed Defendants it would provide them with claim charts showing that Defendants' Xperia 5 III and 5 IV phones infringe the 723 Patent, and, on or about November 6, 2023, ImberaTek sent Defendants claim charts reading the 723 Patent on Defendants' products. Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, on information and belief, Defendants have had knowledge of the 723 Patent and that their activities infringe the 723 Patent since at least January 27, 2021 and no later than August 24, 2023. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021 and no later than August 24, 2023 that their customers, distributors, and other purchasers of the 723 Accused Products infringed the 723 Patent at least because Defendants had knowledge of their infringement of the 723 Patent.

86.    Defendants' acts of infringement of the 723 Patent have been committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 723 Patent,

nor could they reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, Defendants continued their infringing activities. Defendants' directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

87.     On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 723 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the 723 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of the 723 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website, press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 723 Accused Products or products containing infringing chips in the 723 Accused Products. Defendants also manufactured the 723 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge of the 723 Patent and their infringement since at least January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

88.     On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed one or more claims of the 723 Patent, by offering to sell, selling, and/or importing into the United States material components of

the 723 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the 723 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the 723 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 1 of the 723 Patent for the reasons set forth above.

89.     The infringing semiconductor chips of the 723 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

90.     ImberaTek has suffered and continues to suffer damages as a result of Defendants' infringement of the 723 Patent.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 9,107,324

91.     ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

92.     Defendants, without ImberaTek's authority, have been making, using, offering to sell, selling, and importing, and continue to make, use, offer to sell, sell, and import, in the United States at least the Accused Products, certain of which directly infringe one or more claims of the 324 Patent, literally or under the doctrine of equivalents.

93.     The claims of the 324 Patent are valid and enforceable.

94.     At least the Xperia 5 II, Xperia 5 III, Xperia 5 IV, Xperia PRO, Xperia PRO-I, Xperia 1 II, Xperia 1 III, Xperia 1 IV, and Xperia 1 V, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 324 Patent having the same or similar PMIC components (the PM8150A, PM8150B, PM8250,

PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs) as the forgoing

specifically identified product models (the "324 Accused Products"), infringe at least one claim of

the 324 Patent. For example, claim 17 recites:

> Circuit module, comprising
>
> a conductor layer comprising conductors, the conductors having a first surface and a second surface and at least two layers of metal between the first surface and the second surface;
>
> a first insulator layer having a first surface and a second surface, the second surface of the first insulator layer covering the first surface of the conductors;
>
> at least one second insulator layer on the first surface of the first insulator layer;
>
> at least one component inside the at least one second insulator layer, the at least one component comprising contact terminals containing at least one layer of metal;
>
> contact elements between at least some of the contact terminals and at least some of the conductors for forming electrical contacts, the contact elements comprising an intermediate layer on the surface of the contact terminal, the intermediate layer containing at least one layer of metal, a contact surface area ($A_{CONT\ 1}$) between the intermediate layer and the contact terminal being less than a surface area ($A_{PAD}$) of the contact terminal;
>
> at least one layer of metal in the contact terminals containing a first metal;
>
> at least one layer of metal in the conductors containing a second metal; and
>
> the intermediate layer containing a third metal.

95.     The 324 Accused Products and Defendants' infringing activities violate one or

more subsections of 35 U.S.C. § 271.

96.     On information and belief, Defendants have infringed and continue to infringe in

violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims

of the 324 Patent, including at least claim 17, by making, using, offering to sell, selling, and

importing the 324 Accused Products without authority or license. The 324 Accused Products,

and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims

of the 324 Patent. In that regard, the exemplary claim charts attached as Exhibits 32-40 show how

the 324 Accused Products include each element of claim 17 of the 324 Patent. Defendants thereby have directly infringed one or more claims of the 324 Patent.

97.    As shown in the charts, the 324 Accused Products include a "[c]ircuit module, comprising: a conductor layer comprising conductors, the conductors having a first surface and a second surface and at least two layers of metal between the first surface and the second surface." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 324 Accused Products show a circuit module with a conductor layer including conductors having a first surface and a second surface and at least two layers of metal, *i.e.*, copper and titanium, between the first surface and the second surface. (*See* Exhibits 32-40.)

98.    As also shown in the charts, the 324 Accused Products include "a first insulator layer having a first surface and a second surface, the second surface of the first insulator layer covering the first surface of the conductors." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 324 Accused Products show a first insulator layer having a first surface and a second surface, the second surface of the first insulator layer covering the first surface of the conductors. (*See* Exhibits 32-40.)

99.    As further shown in the charts, the 324 Accused Products include "at least one second insulator layer on the first surface of the first insulator layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 324 Accused Products show at least one second insulator layer on the first surface of the first insulator layer. (*See* Exhibits 32-40.)

100.    As further shown in the charts, the 324 Accused Products include "at least one component inside the at least one second insulator layer, the at least one component comprising contact terminals containing at least one layer of metal." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 324 Accused Products show at least one component inside the at least one second insulator layer, the at least one component including contact terminals containing at least one layer of metal. (*See* Exhibits 32-40.)

101.    As further shown in the charts, the 324 Accused Products include "contact elements between at least some of the contact terminals and at least some of the conductors for forming electrical contacts, the contact elements comprising an intermediate layer on the surface of the contact terminal, the intermediate layer containing at least one layer of metal, a contact surface area ($A_{CONT\ 1}$) between the intermediate layer and the contact terminal being less than a surface area ($A_{PAD}$) of the contact terminal." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 324 Accused Products show contact elements between at least some of the contact terminals and at least some of the conductors for forming electrical contacts, the contact elements including an intermediate layer on the surface of the contact terminal, the intermediate layer containing at least one layer of metal, *i.e.*, titanium, a contact surface area ($A_{CONT\ 1}$) between the intermediate layer and the contact terminal being less than a surface area ($A_{PAD}$) of the contact terminal. (*See* Exhibits 32-40.)

102.    As further shown in the charts, the 324 Accused Products include "at least one layer of metal in the contact terminals containing a first metal." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and

PM8550BH PMICs used in the 324 Accused Products show at least one layer of metal in the contact terminals containing a first metal, *i.e.*, aluminum. (*See* Exhibits 32-40.)

103.    As further shown in the charts, the 324 Accused Products include "at least one layer of metal in the conductors containing a second metal." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 324 Accused Products show at least one layer of metal in the conductors containing a second metal, *i.e.*, copper or titanium. (*See* Exhibits 32-40.)

104.    As further shown in the charts, the 324 Accused Products include "the intermediate layer containing a third metal." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs used in the 324 Accused Products show the intermediate layer containing a third metal, *i.e.*, titanium. (*See* Exhibits 32-40.)

105.    By at least January 27, 2021, ImberaTek disclosed the existence of the 324 Patent to Defendants and informed Defendants that they were "likely utilizing and causing [their] customers and users to utilize" the 324 Patent and "should explore taking a license from ImberaTek to cover both [their] past and future utilization of" that patent. On August 24, 2023, ImebraTek informed Defendants it would provide them with claim charts showing that Defendants' Xperia 5 III and 5 IV phones infringe the 324 Patent, and, on or about November 6, 2023, ImberaTek sent Defendants claim charts reading the 324 Patent on Defendants' products. Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, on information and belief, Defendants have had knowledge of the 324 Patent and that their activities infringe the 324 Patent since at least January 27, 2021 and no later than August 24, 2023. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021

and no later than August 24, 2023 that their customers, distributors, and other purchasers of the 324 Accused Products infringed the 324 Patent at least because Defendants had knowledge of their infringement of the 324 Patent.

106.    In addition and in the alternative, by at least the date on which this Complaint was filed, ImberaTek disclosed the existence of the 324 Patent to Defendants and identified at least some of Defendants' activities that infringe the 324 Patent. Thus, Defendants have had knowledge of the 324 Patent and that their activities infringe the 324 Patent since at least the date on which this Complaint was filed. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least the date on which this Complaint was filed that their customers, distributors, and other purchasers of the 324 Accused Products are infringing the 324 Patent at least because Defendants have known that they are infringing the 324 Patent.

107.    Defendants' acts of infringement of the 324 Patent have been committed and are being committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 324 Patent, nor could they reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, Defendants continued their infringing activities. Defendants' directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

108.    On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 324 Patent under 35 U.S.C. § 271(b) by actively

encouraging others to import, make, use, sell, and/or offer to sell the 324 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of the 324 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website, press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 324 Accused Products or products containing infringing chips in the 324 Accused Products. Defendants also manufactured the 324 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge of the 324 Patent and their infringement since at least January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

109.   On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed and continue to contributorily infringe one or more claims of the 324 Patent by offering to sell, selling, and/or importing into the United States material components of the 324 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the 324 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the 324 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 17 of the 324 Patent for the reasons set forth above.

110.    The infringing semiconductor chips of the 324 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

111.    ImberaTek has suffered and continues to suffer damages as a result of Defendants' infringement of the 324 Patent.

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 8,487,194**

112.    ImberaTek repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

113.    Defendants, without ImberaTek's authority, have been making, using, offering to sell, selling, and importing, and continue to make, use, offer to sell, sell, and import, in the United States at least the Accused Product, certain of which directly infringe one or more claims of the 194 Patent, literally or under the doctrine of equivalents.

114.    The claims of the 194 Patent are valid and enforceable.

115.    At least the Xperia 5 II, Xperia 5 III, Xperia 5 IV, Xperia PRO, Xperia PRO-I, Xperia 1 II, Xperia 1 III, Xperia 1 IV, and Xperia 1 V, and any other of Defendants' products made, sold, or used in the United States, or imported into the United States during the term of the 194 Patent having the same or similar PMIC and AP components as the forgoing specifically identified product models (the "194 Accused Products"), infringe at least one claim of the 194 Patent. For example, claim 1 recites:

A circuit board, comprising:

a conductor-pattern layer;

an insulating-material layer supporting the conductor-pattern layer;

at least one component inside the insulating-material layer, the component having a plurality of contact areas;

Page 37 of 44

a set of contact elements between the conductor-pattern layer and contact areas for electrically connecting the conductor-pattern layer and the at least one component;

wherein the set of contact elements comprise a plurality of individual contact elements for at least one single contact area in said plurality of contact areas.

116. The 194 Accused Products and Defendants' infringing activities violate one or more subsections of 35 U.S.C. § 271.

117. On information and belief, Defendants have infringed and continue to infringe in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, one or more claims of the 194 Patent, including at least claim 1, by making, using, offering to sell, selling, and importing the 194 Accused Products without authority or license. The 194 Accused Products, and/or Defendants' manufacturing thereof, satisfy each and every limitation of one or more claims of the 194 Patent. In that regard, the exemplary claim charts attached as Exhibits 41-52 show how the 194 Accused Products include each element of claim 1 of the 194 Patent. In particular, the claim charts show how products that include one or more of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, or PM8550BH PMICs, and/or the SM8450 AP, infringe. Defendants thereby have directly infringed one or more claims of the 194 Patent.

118. As shown in the charts, the 194 Accused Products include "[a] circuit board, comprising: a conductor-pattern layer." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs, and the SM8450 AP, used in the 194 Accused Products show a circuit board with a conductor-pattern layer. (*See* Exhibits 41-52.)

119. As also shown in the charts, the 194 Accused Products include "an insulating-material layer supporting the conductor-pattern layer." For example, cross sections of the

PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs, and the SM8450 AP, used in the 194 Accused Products show an insulating-material layer supporting the conductor-pattern layer. (*See* Exhibits 41-52.)

120.    As further shown in the charts, the 194 Accused Products include "at least one component inside the insulating-material layer, the component having a plurality of contact areas." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs, and the SM8450 AP, used in the 194 Accused Products show at least one component inside the insulating-material layer, the component having a plurality of contact areas. (*See* Exhibits 41-52.)

121.    As further shown in the charts, the 194 Accused Products include "a set of contact elements between the conductor-pattern layer and contact areas for electrically connecting the conductor-pattern layer and the at least one component." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs, and the SM8450 AP, used in the 194 Accused Products show a set of contact elements between the conductor-pattern layer and contact areas for electrically connecting the conductor-pattern layer and the at least one component, as seen in an EDS copper layer image showing a copper conductor-pattern layer and copper contact elements. (*See* Exhibits 41-52.)

122.    As further shown in the charts, the 194 Accused Products include "wherein the set of contact elements comprise a plurality of individual contact elements for at least one single contact area in said plurality of contact areas." For example, cross sections of the PM8150A, PM8150B, PM8250, PM8350, PM8350B, PM8350C, PM8350BH, PM8450, and PM8550BH PMICs, and the SM8450 AP, used in the 194 Accused Products show that the set of contact

elements comprise a plurality of individual contact elements for at least one single contact area in the plurality of contact areas. (*See* Exhibits 41-52.)

123. By at least January 27, 2021, ImberaTek disclosed the existence of the 194 Patent to Defendants in an "exemplary listing of our patents" and stated that "ImberaTek expects that you may currently be using, or will in the future be using, additional patented inventions from this portfolio." And by at least October 22, 2024, ImberaTek advised Defendants that they "utilize[] and cause[] [their] customers and users to utilize [the 194 Patent]. By way of non-limiting example, the processors in your cell phones since at least the Xperia 10 use this patent. This is a further example of why Sony requires a license to ImberaTek's patent portfolio." Further, on information and belief, Defendants monitor ImberaTek's patent portfolio. Thus, on information and belief, Defendants have had knowledge of the 194 Patent and that their activities infringe the 194 Patent since at least January 27, 2021 and no later than October 22, 2024. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least January 27, 2021 and no later than October 22, 2024 that their customers, distributors, and other purchasers of the 194 Accused Products infringed the 194 Patent at least because Defendants had knowledge of their infringement of the 194 Patent.

124. In addition, and in the alternative, by at least the date on which this Complaint was filed, ImberaTek disclosed the existence of the 194 Patent to Defendants and identified at least some of Defendants' activities that infringe the 194 Patent. Thus, Defendants have had knowledge of the 194 Patent and that their activities infringe the 194 Patent since at least the date on which this Complaint was filed. Based on ImberaTek's disclosures, Defendants have also known or should have known since at least the date on which this Complaint was filed that their customers,

distributors, and other purchasers of the 194 Accused Products are infringing the 194 Patent at least because Defendants have known that they are infringing the 194 Patent.

125.     Defendants' acts of infringement of the 194 Patent have been committed and are being committed with full knowledge of ImberaTek's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, Defendants could not reasonably or subjectively have believed that their actions do or did not constitute infringement of the 324 Patent, nor could they reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, Defendants continued their infringing activities. Defendants' directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling ImberaTek to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

126.     On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, Defendants have actively, knowingly, and intentionally induced infringement of one or more claims of the 194 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the 194 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, Defendants have actively promoted the sale, use, and importation of the 194 Accused Products in marketing materials, technical specifications, data sheets, web pages on their website, press releases, and user manuals, as well as at trade shows and through their sales and distribution channels that encourage infringing sales, offers to sell, and importation of the 194 Accused Products or products containing infringing chips in the 194 Accused Products. Defendants also manufactured the 194 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, Defendants have had knowledge

of the 194 Patent and their infringement since at least January 27, 2021, and either knew that the induced acts constituted patent infringement or, alternatively, were willfully blind to the infringement.

127.    On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, Defendants have contributorily infringed and continue to contributorily infringe one or more claims of the 194 Patent by offering to sell, selling, and/or importing into the United States material components of the 194 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the 194 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, the 194 Accused Products include infringing processors, integrated circuits, and other semiconductor components that are a material part of at least the invention of claim 1 of the 194 Patent for the reasons set forth above.

128.    The infringing semiconductor chips of the 194 Accused Products are not materially changed by subsequent processes and do not become trivial and nonessential components of another product.

129.    ImberaTek has suffered and continues to suffer damages as a result of Defendants' infringement of the 194 Patent.

### PRAYER FOR RELIEF

WHEREFORE, ImberaTek respectfully requests the following relief:

(A) The entry of judgment in favor of ImberaTek, and against Defendants, that Defendants have infringed and continue to infringe one or more claims of the Asserted Patents;

(B) The entry of judgment in favor of ImberaTek, and against Defendants, that Defendants have willfully infringed one or more claims of the Asserted Patents;

(C) The entry of a judgment awarding ImberaTek all damages resulting from Defendants' infringement, including no less than a reasonable royalty, and that such amount be trebled based on Defendants' willful, intentional, and deliberate infringement pursuant to 35 U.S.C. § 284, including pre-judgment and post-judgment interest and without limitation under 35 U.S.C. § 287;

(D)   The entry of a judgment awarding ImberaTek its attorneys' fees pursuant to 35 U.S.C. § 285;

(E) The entry of judgment in favor of ImberaTek, and against Defendants, that interest, costs, and expenses be awarded in favor of ImberaTek;

(F) An accounting and/or supplemental damages for all damages occurring after any discovery cutoff;

(G) A grant of preliminary and permanent injunctions enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, from infringing, contributing to the infringement of, or inducing the infringement of the Asserted Patents that have not expired; and

(H) That this Court order such other relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, ImberaTek respectfully demands a trial by jury in this Action on all issues so triable.

Dated: July 2, 2026

Respectfully submitted,

*/s/ Geoff Culbertson*

Peter J. McAndrews (*pro hac vice*)
pmcandrews@mcandrews-ip.com
Matthew G. McAndrews (*pro hac vice*)
mmcandrews@mcandrews-ip.com
David Z. Petty
dpetty@mcandrews-ip.com
Rajendra A. Chiplunkar
rchiplunkar@mcandrews-ip.com
McANDREWS, HELD & MALLOY, LTD.
500 West Madison St., 34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100

Geoff Culbertson
TX Bar No. 24045732
gpc@texarkanalaw.com
Kelly Tidwell
TX Bar No. 20020580
kbt@texarkanalaw.com
PATTON, TIDWELL & CULBERTSON, LLP
2800 Texas Boulevard (75503)
Post Office Box 5398
Texarkana, TX 75505-5398
Telephone: (903) 792-7080
Facsimile: (903) 792-8233

*Attorneys for Plaintiff,*
ImberaTek, LLC